[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11934
_____

D.C. Docket No. 2:18-cr-14056-RLR-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSE ANTONIO MORALES,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 5, 2021)

Before JORDAN, MARCUS, and GINSBURG,[*] Circuit Judges.

_____

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia
Circuit, sitting by designation.

MARCUS, Circuit Judge:

Based on evidence seized during a search of his home, Jose Antonio Morales was convicted of possession of marijuana with intent to distribute and of unlawful possession of a firearm and ammunition. On appeal, Morales claims that the affidavit supporting the search warrant -- which reported that police had found a small amount of marijuana and related items in trash outside Morales's house on two separate occasions three days apart -- did not establish probable cause to justify the search. We need not decide whether Morales is correct, for even if he is (and this matter is hotly contested), suppression of the fruits of the search would be inappropriate under the good faith exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897, 922 (1984).

The exclusionary rule exists to deter unreasonable searches, but the police here did exactly what the Fourth Amendment required of them: they obtained a warrant in good faith from a neutral magistrate and reasonably relied on it. They had no reason to believe that probable cause was absent despite the magistrate's authorization. There is no evidence in this record that the affidavit supporting the warrant misled the magistrate or that it contained false information. The affidavit was not lacking in indicia of probable cause so as to render the executing officers' belief in its existence unreasonable. Nor, finally, was the warrant facially deficient

2

because it failed to particularize the place to be searched or the things to be seized. All of that makes this case a clear application of the good faith exception.

Morales also claims that the district court lacked subject matter jurisdiction over the unlawful possession of a firearm and ammunition charge because his indictment failed to allege that he knew he was a convicted felon. But in United States v. Moore, we held that such an omission is not a jurisdictional defect. 954 F.3d 1322, 1336–37 (11th Cir. 2020). We therefore affirm Morales's convictions.

## I.

### A.

Around May 15, 2018, the St. Lucie County Sherriff's Office received an anonymous tip that Jose Antonio Morales was selling narcotics out of his Fort Pierce, Florida home. That day -- trash pick-up day for the neighborhood -- Detective Bryan Saliba and Detective Dietrich searched trash cans located at the end of the driveway at Morales's single-family home. They found a plastic bag containing small amounts of raw marijuana, and took these pictures:



Just three days later (the next trash pick-up day), Saliba and another detective conducted another trash pull at Morales's residence, which yielded "multiple burnt

3

marijuana blunts" and "multiple cut vacuum sealed plastic bags," one of which was labeled "Kush":



Two weeks passed. Then, on June 1, Saliba applied for a warrant to search Morales's home for evidence of illegal marijuana possession or distribution. Saliba's supporting affidavit recounted the trash-pull evidence, save for one important detail: the affidavit made no mention of the tip that Morales was selling drugs from his house. The affidavit further explained that Saliba had been a Sheriff's Deputy for three years and was then assigned as a detective. Saliba averred that he had participated in 50 narcotics investigations, worked drug cases at the street level, and attended approximately 100 hours of narcotics investigation training. He explained that based on his training and experience, "the word 'Kush' is commonly used as a slang word to describe marijuana/cannabis." A St. Lucie County Circuit Court judge granted the application that day and issued a warrant to search Morales's home.

Another week passed before Saliba and other officers executed the search warrant, on June 8. Though the trash pulls had revealed just a handful of marijuana evidence, the search of Morales's home turned up considerably more

4

evidence of illegal activity.  Most significantly, the officers found a loaded .45 caliber Kahr CW pistol, two boxes of ammunition, and 972 grams of marijuana in a bedroom safe.  In the kitchen, they found five grams of marijuana, two marijuana pipes, two marijuana grinders, plastic baggies, and a digital scale.  The officers discovered 86 grams of marijuana in the laundry room and less than one gram of cocaine in a bedroom dresser.  Morales's girlfriend, who was present for the search (Morales arrived on the scene later), claimed that the gun belonged to her.  Morales told the police that all the marijuana belonged to him, that he used it only for personal consumption, and that he possessed a medical marijuana card.

## B.

A federal grand jury in the Southern District of Florida returned an indictment charging Morales with: (1) knowingly possessing a firearm and ammunition after having been convicted of a crime punishable by more than one year in prison, in violation of 18 U.S.C. § 922(g)(1); and (2) possession with intent to distribute a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D).  Morales pled not guilty.

Before trial, Morales moved to suppress the evidence recovered during the search of his home.  He argued that Saliba's affidavit did not establish probable cause because it did not explain the reason for the trash pulls, reported only minimal amounts of marijuana, and made no mention of items linking the trash to

Morales's residence.  Morales also claimed that the affidavit deliberately or recklessly contained false information.  Specifically, he alleged that the affidavit's description of the evidence was false because not all the evidence described appeared in the photographs submitted with the affidavit, and that the affidavit improperly omitted the fact that Morales's residence abutted an open lot where neighborhood youth routinely used marijuana.

The magistrate judge presiding over the suppression motion allowed limited testimony on the allegation that the affidavit omitted the fact that the trash stood next to an open lot.  Detective Saliba testified that he did not know the field next to Morales's home was a frequent venue for drug use.  Saliba also clarified that he found the trash cans at the end of Morales's driveway on days scheduled for trash pick-up and that he found the marijuana evidence within sealed trash bags, not loose in the can.

Based on this testimony, the magistrate judge concluded in her Report and Recommendation that the omission of facts about the neighboring field had not been intentional or reckless; nor did any inconsistency between the photographs and the affidavit's description of the evidence show that the description was false. The magistrate judge next observed that the Eleventh Circuit had not decided "whether [a] small amount[] of drugs found during a trash pull is sufficient [to establish probable cause] without any other evidence."  Still, since the affidavit

6

recounted the discovery of evidence from trash pulls on two separate days, she held that the affidavit established probable cause that some items connected with unlawful marijuana activity would be found in Morales's home.  Finally, the magistrate judge concluded that even if there was not probable cause, the good faith exception to the exclusionary rule applied to preclude suppression of the fruits of the search.  Morales filed objections to the Report and Recommendation, but the district court adopted the Report in full.

Morales proceeded to trial, where he stipulated that he had been convicted of a felony offense before the date of his charged firearm and ammunition possession. He called his girlfriend as a witness, who testified that the pistol belonged to her and that Morales had never held the gun because he knew he was prohibited from doing so.  Nevertheless, the jury found Morales guilty on both counts.

The district court sentenced Morales to concurrent 84-month sentences on each count and four years' supervised release.  Morales's effective Sentencing Guidelines range was 120 months due to prior felony convictions for aggravated assault and possession of marijuana with intent to distribute, but the district court granted a downward variance.  Morales's presentence investigation report ("PSI") noted that the police conducted the trash pulls based on an anonymous tip -- the first time any information about this tip appeared in the record.  Morales did not object to this PSI fact.  He timely appealed the district court's judgment.

7

## II.

We reject Morales's first claim on appeal -- that the district court erred in denying his motion to suppress the evidence found during the search of his home. Even if we assume Saliba's affidavit did not establish probable cause, Saliba and the other searching officers relied in good faith on the warrant.

In the typical trash-pull case, trash-pull findings either corroborate or draw corroboration from other evidence of illegal activity in the home to be searched, such as reports of drug activity in the home or maybe a resident's history of criminal drug activity. See, e.g., United States v. Jones, 471 F.3d 868, 873 (8th Cir. 2006) (drug residue found in two successive trash pulls combined with anonymous tip reporting drug sales at the target address). Morales's case falls within a rarer set: warrant applications whose case for probable cause rises or falls on trash-pull evidence standing alone. This species of affidavit is rare enough that we have not passed upon its sufficiency. Our sister circuits have generally held that an affidavit reporting a single trash pull that yielded only a small amount of drug evidence does not establish probable cause. See United States v. Lyles, 910 F.3d 787, 790, 794 (4th Cir. 2018); United States v. Abernathy, 843 F.3d 243, 246–47, 254–57 (6th Cir. 2016). Moreover, trash evidence that does establish probable cause often includes documents linking the trash to the target residence -- evidence that is absent here. See, e.g., United States v. Montieth, 662 F.3d 660,

8

664–65 (4th Cir. 2011) (trash pull yielded bills addressed to the defendant at the target residence).

On the other hand, some courts have concluded that trash pull evidence can on its own support probable cause when a single pull yields a great volume of evidence that clearly indicates illegal drug activity or when police find a smaller quantity of (perhaps less inculpatory) evidence over the course of two successive trash pulls, thereby establishing a trend.  See United States v. Briscoe, 317 F.3d 906, 907–09 (8th Cir. 2003) (single trash pull found "forty marijuana seeds and twenty-five marijuana stems"); United States v. Leonard, 884 F.3d 730, 734–35 (7th Cir. 2018) ("two trash pulls taken a week apart, both testing positive for cannabis, [were] sufficient standing alone to establish probable cause" where the trash contained "sufficient indicia of residency").

Morales's case lies somewhere in between.  But we need not decide the question of probable cause in order to resolve this case.  Even in the absence of probable cause, Morales is not entitled to suppression because the officers reasonably relied in good faith on a facially valid warrant.

The Fourth Amendment prohibits unreasonable searches but makes no mention of a remedy.  U.S. Const. amend. IV.  The "judicially created" exclusionary rule fills this gap by providing that generally, "[e]vidence seized as the result of an illegal search may not be used by the government in a subsequent

criminal prosecution." United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002) (internal quotation marks and citation omitted). The exclusionary rule is not a personal right but rather a "prudential doctrine" whose "sole purpose . . . is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236–37 (2011) (internal quotation marks and citations omitted). The rule therefore applies only where its application will in fact deter "unreasonable searches and seizures." U.S. Const. amend. IV; Davis, 564 U.S. at 237. A rule requiring suppression of evidence seized in an unreasonable manner cannot -- and should not -- deter an officer from "acting as a reasonable officer would and should act in similar circumstances." Leon, 468 U.S. at 920 (internal quotation marks and citation omitted). In such a case, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way." Id. (internal quotation marks and citation omitted). Thus, under the good faith exception to the exclusionary rule, courts decline to suppress evidence when suppression would not further the rule's deterrent purpose. See United States v. Taylor, 935 F.3d 1279, 1289 (11th Cir. 2019), as corrected (Sept. 4, 2019), cert. denied, 140 S. Ct. 1548 (2020) ("To date, the Supreme Court has applied the good-faith exception when, among other things, officers reasonably relied on a warrant that was later deemed invalid for lack of probable cause, on a warrant that erroneously appeared outstanding due to an error in a court or police database, on a statute that was later deemed unconstitutional,

10

and on a judicial decision that was later overruled") (citations omitted); see also

United States v. Green, 981 F.3d 945, 957 (11th Cir. 2020) (good faith exception

applied where officers reasonably relied on state-court orders to conduct

warrantless searches of historical cell-site and real-time tracking data five years

before the Supreme Court held such searches violated the Fourth Amendment in

Carpenter v. United States, 138 S. Ct. 2206, 2217–19, 2221 (2018)); Taylor, 935

F.3d at 127–88, 1291–93 (good faith exception applied to reasonable reliance on a

warrant that was "void at issuance" due to the issuing magistrate's lack of

jurisdiction where there was "no indication that the . . . officers sought to deceive

the magistrate judge or otherwise acted culpably or in a way that necessitate[d]

deterrence").

That suppression will not deter future Fourth Amendment violations is

especially clear "when an officer acting with objective good faith has obtained a

search warrant from a judge or magistrate and acted within its scope." Leon, 468

U.S. at 920. After all, "[i]t is the magistrate's responsibility to determine whether

the officer's allegations establish probable cause and, if so, to issue a warrant

comporting in form with the requirements of the Fourth Amendment." Id. at 921.

It is beyond dispute that the law should encourage officers to procure warrants

before conducting searches of the home, not discourage them from doing so.

"Penalizing the officer for the magistrate's error, rather than his own, cannot

logically contribute to the deterrence of Fourth Amendment violations." Id. For these reasons, the paradigmatic application of the good faith exception is to "evidence obtained in objectively reasonable reliance" on a warrant, even if a court later invalidates the warrant for lack of probable cause. See id. at 922; United States v. Robinson, 336 F.3d 1293, 1295, 1297 (11th Cir. 2003) (good faith exception applied where there was "nothing in the record to suggest [the officer's] reliance on the warrant was objectively unreasonable," even though the affidavit did not establish probable cause because, among other things, it included stale information and relied on trash pulls from a "multi-family trash receptacle"); Martin, 297 F.3d at 1320 (good faith exception applied where issuing magistrate was to blame for incorrectly finding probable cause based on an affidavit that did not include specific dates to establish that the information was not stale, and the affiant officer relied on the warrant in good faith and did not omit facts relevant to probable cause).

This case sits at the core of the good faith exception. The officers did everything they should have. They obtained and relied on a warrant from a neutral magistrate and had no reason to think that probable cause was absent despite the magistrate's authorization. They did not mislead the magistrate or withhold material information. Therefore, even if we assume that the magistrate erred in finding probable cause, suppressing the evidence found during the search of

12

Morales's home would do nothing to deter future police misconduct. All that it would do is prevent a factfinder from considering competent and probative evidence of criminal wrongdoing. The district court was correct to hold that the good faith exception barred suppression of the seized evidence.

A.

The government bears the burden of demonstrating that the good faith exception applies.[2] See Robinson, 336 F.3d at 1297. We review de novo whether the good faith exception applies, "but the underlying facts upon which that determination is based are binding on appeal unless clearly erroneous." Id. at 1295 (internal quotation marks and citation omitted).

The good faith exception "applies in all but four limited sets of circumstances": "(1) where the magistrate . . . issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role . . . ;(3) where the affidavit

_____

[2] Morales correctly complains that the magistrate judge improperly assigned the burden on this issue to the defense, though it is less clear that the district court made the same error during its de novo review of the Report and Recommendation. While Morales did object to the Report and Recommendation's good faith conclusion, he did not specifically note the magistrate's burden shifting as a ground for his objection, and therefore forfeited this argument. See Fed. R. Crim. P. 59(a); 11th Cir. R. 3-1. In any event, our own review is de novo, and we affirm that the burden lies with the government.

supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid." Martin, 297 F.3d at 1313 (internal quotation marks and citations omitted).  If none of these four circumstances exists, we proceed to determine whether the executing officer "reasonably relied upon the search warrant." Id. at 1318.

This case does not implicate any of these four scenarios.  There is no indication that the affidavit contained any falsehoods that misled the issuing magistrate.  In fact, the district court held that Saliba did not intentionally or recklessly include false or misleading information or omit relevant facts, and Morales does not argue otherwise on appeal.  Nothing in the record suggests the magistrate wholly abandoned his judicial role by, for example, accompanying the officers executing the search, failing to read the warrant, or neglecting to independently assess probable cause. See id. at 1316–17.  Nor was the warrant facially deficient: it particularized the place to be searched (Morales's precise address) and listed the things to be seized (controlled substances and related materials).

14

Indeed, the only exception to the good faith rule that Morales argues about is the third one: "where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. at 1313 (citation omitted).  But this case is not an iteration of that circumstance.  While we must determine this exception's application "on a case-by-case basis," "we have guidelines which help us determine what critical information should be included in a search warrant affidavit to establish a finding of probable cause": the affidavit should "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched" and should "establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id. at 1313–14 (internal quotation marks and citations omitted); see also Illinois v. Gates, 462 U.S. 213, 238 (1983) (probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place").

As for a probability of finding evidence or contraband, the affidavit recounted two trash pulls that yielded evidence of illegal drug possession in the residence.  To be sure, the affidavit did not list especially voluminous evidence: a plastic bag containing raw marijuana, multiple burnt blunts, and multiple cut vacuum sealed plastic bags, one of which bore the label "Kush."  The affidavit did

not specify how many vacuum bags there were or how much marijuana was in the plastic bag; if the photographs included in the affidavit depicted the full extent of the evidence, there were only a few vacuum sealed bags and a few marijuana stems. Even so, the warrant cited Fla. Stat. § 893.13, which criminalizes the mere possession of marijuana (in addition to possession with intent to distribute, sale of marijuana, etc.). Thus, the affidavit did not need to establish a fair probability that Morales's residence housed a marijuana distribution operation, rather merely that some marijuana would be found there.

Critically, the affidavit recounted that Detective Saliba found marijuana evidence in Morales's trash on two separate occasions. As the Seventh Circuit has observed, "[w]hile one search turning up marijuana in the trash might be a fluke, two indicate a trend." Leonard, 884 F.3d at 734; compare State v. Jacobs, 437 So. 2d 166, 168 (Fla. Dist. Ct. App. 1983) ("The fact that marijuana and cannabis seeds were found on two separate occasions within one month's time suggests a continuing violation of the drug laws and indicates a fair probability that marijuana or cannabis would be found in the house.") (internal quotation marks omitted) with Raulerson v. State, 714 So. 2d 536, 537 (Fla. Dist. Ct. App. 1998) (single trash pull yielding a small volume of marijuana evidence did "not suggest a pattern of continuous drug activity"). The affidavit reported that the trash pulls occurred three days apart. While this timeframe might suggest the marijuana came from an

16

isolated incident within the three-day period, it also could indicate a recurring frequency of marijuana use.  The warrant further disclosed that the affiant was "familiar with the manner in which drugs are packaged, stored, and distributed," having worked 50 narcotics investigations, attended approximately 100 hours of narcotics training courses, and worked drug cases at the street level.  Thus, the affidavit was not so bare that the executing officers' belief that Morales's home contained evidence of illegal drug activity was "entirely unreasonable."  Martin, 297 F.3d at 1313 (internal quotation marks and citation omitted).

Morales objects that the trash pulls described in the affidavit were two weeks old by the time the magistrate issued the warrant.  Since Morales did not raise this staleness challenge in his motion to suppress, our review on this point is for plain error.  United States v. Young, 350 F.3d 1302, 1305 (11th Cir. 2003).  "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).  There is no Supreme Court or Eleventh Circuit case holding that marijuana evidence found in two trash pulls conducted three days apart becomes stale after two weeks.  On plain error review, the elapse of two weeks between the trash pulls and the warrant

17

application did not render the executing officers' belief in probable cause unreasonable.

The affidavit also contained at least some evidence linking Morales, his home, and the evidence of illegal drug activity. It averred that Morales resided at the target residence, described the searched trash cans as "the trash container of [the] target residential unit," and stated that the officers found the cans to be "specific to the target unit- located at the northwest portion of the property" "next to the roadway." Thus, the affidavit explained that the searched cans were associated with Morales's house. The affidavit also contained a photograph of the home, which appears to portray a single-family unit (though the affidavit did not expressly describe it as such). While this evidence may or may not have been enough to tie the trash to the residence for probable cause purposes, the executing officers could reasonably have believed there was a "fair probability" that the trash in a can placed at the edge of a single-family home's property came from that home. Gates, 462 U.S. at 238.

All told, setting aside whether the affidavit actually established probable cause, it was not so lacking in indicia of probable cause that it provided "no hint" as to why the police believed they would find incriminating evidence in the residence. Martin, 297 F.3d at 1314 (internal quotation marks and citation omitted).

18

B.

Since none of the exceptions to the Leon good faith rule apply, we proceed to determine whether Detective Saliba's reliance on the warrant was objectively reasonable.  It was.

"The good faith exception requires the court to consider whether a reasonably well-trained officer would know that the [search] was illegal despite the magistrate's authorization."  Id. at 1318.  In reviewing whether an officer's reliance on a warrant was objectively reasonable, we review the entire record, including information known to the executing officers "that was not presented in the initial search warrant or application or affidavit."  Id.

As just described, the affidavit linked the trash to Morales's residence and provided some evidence of repeated drug activity in the home.  Two other sets of facts not listed in the affidavit, but known to Saliba at the time of the warrant's execution, bolster the reasonableness of Saliba's reliance on the warrant.  The first set concerns the link between the evidence and the home.  Detective Saliba testified at the suppression hearing that he found the trash cans "in front of the residence at the end of the driveway" on "trash day for the neighborhood."  He further testified that the cans "were at the end of the driveway, to the northwest of the driveway directly in front of the residence," which he clarified was "a single family home."  The cans were "[c]onnected to the driveway in front of the

19

residence." Saliba explained that the neighborhood layout was "standard, I guess, houses next door to each other." Other houses had their own trash cans placed in front of the homes. This testimony fairly confirms the inference, already evident from the affidavit, that the searched cans were for the use of the Morales home only. Trash cans set out in front of single-family homes on trash day typically contain trash drawn from those homes.

Moreover, and equally significant, Detective Saliba testified that he found the marijuana evidence within tied-up trash bags in the cans; the evidence was not loose in the can. This sharply minimized the chance that some passerby (like teenagers in the nearby vacant lot), rather than a resident of Morales's home, tossed the incriminating material into the trash.

The second set speaks to the likelihood of ongoing drug activity within Morales's home. Saliba's testimony that both trash pulls were conducted on trash pick-up day suggests that the marijuana found on the two days reflected separate instances of marijuana use rather than a single outlier event, such as discarding of refuse from a house party. Additionally, Morales's PSI states that the St. Lucie County Sheriff's Office conducted the trash pulls based on an anonymous tip that Morales was selling narcotics from his home.[3] Morales did not object to this fact,

---

[3] Specifically, the PSI reads:

> On or before, May 15, 2018, law enforcement received information from an anonymous source who stated the defendant, Jose Antonio Morales, was selling

so he has admitted it.  Cf. United States v. Beckles, 565 F.3d 832, 844 (11th Cir. 2009) ("Facts contained in a PSI are undisputed and deemed to have been admitted unless a party objects to them before the sentencing court with specificity and clarity.") (internal quotation marks and citation omitted).  Rather than disputing the existence of the tip, Morales suggests that there is no evidence Saliba knew about this tip.  However, the PSI relates that the Sheriff's Office conducted the trash pulls "[b]ased on" the tip.  Since Detective Saliba conducted the trash pulls as an agent of the Sheriff's Office, he likely knew the reason for the pulls.  And while Morales is right that there is nothing to suggest this tip was reliable, Saliba's likely awareness of the tip combined with the other facts he knew strengthens the conclusion that he executed the warrant in good faith.

Far from suggesting that a well-trained officer "would have known that the search was illegal despite the judge's authorization," Martin, 297 F.3d at 1320, the entire record establishes that Saliba's reliance on the warrant was objectively reasonable.  The district court therefore properly denied Morales's motion to suppress the fruits of the search of his home.

---

narcotics from his residence located at [Morales's address]. . . . Based on the anonymous information, the St. Lucie County Sheriff's Office (SLCSO) conducted two trash pulls.

III.

Morales next claims Count One of his indictment (the felon-in-possession count) must be dismissed in light of Rehaif v. United States, 139 S. Ct. 2191 (2019).  In Rehaif, the Supreme Court recently held that to secure a felon-in-possession conviction under 18 U.S.C. §§ 922(g) and 924(a)(2), the government must prove not only that the defendant knew he possessed a firearm or ammunition, but also that he knew "of his status as a person barred from possessing a firearm" or ammunition.[4]  139 S. Ct. at 2195.[5]  Morales's indictment did not allege that he knew of his status as a member of a class of persons prohibited from possessing firearms and ammunition (that is, that he knew he had been convicted of a crime punishable by imprisonment for a term greater than one year).[6]  See 18 U.S.C. § 922(g)(1).

---

[4] Section 922(g)(1) provides that it "shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition."  18 U.S.C. § 922(g)(1).  Section 924(a)(2) provides that "[w]hoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."  18 U.S.C. § 924(a)(2).  In Rehaif, which dealt with a prosecution for possessing a firearm as an alien illegally or unlawfully present in the United States under 18 U.S.C. § 922(g)(5), the Supreme Court relied on the text of §§ 922(g) and 924(a)(2) and on the interpretive presumption in favor of scienter to hold that the government must prove that the defendant knew of his status as a member of a group which § 922(g) prohibits from possessing firearms and ammunition.  139 S. Ct. at 2194–97.

[5] The Supreme Court decided Rehaif while Morales's direct appeal was pending, so it applies to his case.  Griffith v. Kentucky, 479 U.S. 314, 328 (1987).

[6] The relevant count, Count One, reads this way:

On or about June 7, 2018, in St. Lucie County, in the Southern District of Florida, the defendant, JOSE ANTONIO MORALES, having been previously convicted of

22

Morales claims that the omission of the knowledge-of-status element caused the indictment to fail to charge a federal criminal offense, thereby depriving the district court of subject matter jurisdiction under 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."). While an indictment's omission of an element of an offense does not strip the district court of jurisdiction, United States v. Brown, 752 F.3d 1344, 1353–54 (11th Cir. 2014), the district court would lack subject matter jurisdiction if the indictment failed to charge conduct that amounts to an offense against the laws of the United States, United States v. Moore, 954 F.3d 1322, 1333 (11th Cir. 2020). Morales argues that after Rehaif, an indictment charging a violation of § 922(g) that does not allege knowledge of prohibited status does not charge an offense against the United States. He contends that Rehaif rendered § 922(g) a non-self-executing provision that does not by itself define a criminal offense. Section 924(a)(2), he reasons, adds the knowledge element that makes prohibited firearm possession a federal crime. We review questions of subject matter jurisdiction de novo. United States v. Iguaran, 821 F.3d 1335, 1336 (11th Cir. 2016) (per curiam).

---

a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm and one or more rounds of ammunition, to wit, one (1) Kahr CW, .45 caliber pistol, and .45 caliber ammunition, in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(g)(1).

Three recent decisions of this Court foreclose Morales's argument.  In United States v. Moore, we rejected the defendants' argument that "because their indictments failed to allege their knowledge of their felon status, the indictment failed to allege a crime, depriving the district court of jurisdiction."  954 F.3d at 1332.  Like Morales's indictment, the defendants' indictments cited and tracked the text of § 922(g)(1) but did not cite § 924(a)(2) or mention the knowledge-of-status element.  Id. at 1332–33 ("DERRICK MILLER and BERNARD MOORE, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm and ammunition in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(g)(1).")  We read Rehaif to have interpreted § 922(g) itself as including a knowledge-of-status element, not as having held that § 922(g) is a non-criminal provision that § 924(a)(2) incorporates to create a criminal offense.  Id. at 1333.

After reviewing the case law on indictment defects, we identified a distinction between cases in which the indictment affirmatively alleges conduct that is not a crime and cases in which the indictment merely omits an element of a valid offense.  "Ultimately," we concluded, "the law is clear: the omission of an element in an indictment does not deprive the district court of subject matter jurisdiction.  A defective indictment only affects jurisdiction when it fails to allege

24

an offense against the United States.  So long as the conduct described in the indictment is a criminal offense, the mere omission of an element does not vitiate jurisdiction."  Id. at 1336.

Since the text of § 922(g) implies a knowledge-of-status element, an indictment that tracks this text sufficiently states a crime against the United States. Id. at 1333, 1336–37.  The Moore indictment alleged violations of § 922(g), a criminal offense, so it was sufficient to confer subject matter jurisdiction. "Reading this knowledge requirement into the statute while also holding that indictments tracking the statute's text are insufficient would be incongruous. Although the government may be well advised to include such mens rea allegations in future indictments, that language is not required to establish jurisdiction."  Id. at 1333.

Our holding in Moore that an indictment materially similar to Morales's was not jurisdictionally deficient after Rehaif forecloses any holding that the district court lacked jurisdiction over Morales's case.  See also United States v. McLellan, 958 F.3d 1110, 1118 (11th Cir. 2020) (relying on Moore to reject an argument that a § 922(g)(1) indictment was jurisdictionally defective because it failed to include a knowledge-of-status element and holding that "there is no jurisdictional defect if an indictment merely fails to include that the defendant *knowingly* committed the crime but otherwise clearly alleges the unlawful conduct that the defendant is

25

accused of committing"); <u>United States v. Innocent</u>, 977 F.3d 1077, 1084 (11th

Cir. 2020) (relying on <u>Moore</u> and <u>McClellan</u> to reject an identical argument).

For all these reasons, we **AFFIRM** the judgment of the district court.

JORDAN, Circuit Judge, concurring in part and concurring in the judgment.

I join the court's opinion as to all but Part II.B.  As to Part II. B, I concur only in the judgment because I would not consider the anonymous tip purportedly received by law enforcement prior to the trash pulls.  First, the police officers did not mention the tip in the affidavit they submitted to obtain the search warrant.  Second, the government did not disclose the tip in arguing the good-faith exception in its response to Mr. Morales' motion to suppress, even though Mr. Morales had argued that the officers should have provided more information to establish probable cause.  *See* D.E. 29 at 14-18.  Third, neither the magistrate judge nor the district court relied on the tip in ruling on the motion to suppress.  *See* D.E. 37 at 11-13; D.E. 42 at 3-4.  Fourth, the existence of the tip only became known when the probation office prepared the pre-sentence investigation report.

Given that the government bore the burden of establishing the good-faith exception, it had the responsibility to bring the tip to the attention of the magistrate judge and the district court when the motion to suppress was being litigated.  It did not do so, and now should not benefit from its failure.  But even without the tip, the officers' reliance was objectively reasonable, and so I concur in the application of the good-faith exception.

27